A08A0614. JOHNSON v. TAYLOR.

(665 SE2d 49)

SMITH, Presiding Judge.

Kurtis Taylor petitioned to adopt his stepson, R. C. J., and to terminate the parental rights of Frederick Johnson, R. C. J.'s biological father, pursuant to OCGA §§ 19-8-6 and 19-8-10. Johnson objected and sought to maintain his parental rights in his son. Following a hearing, the trial court granted Taylor's petition and entered a final decree of adoption. For reasons that follow, we affirm.

On appeal from an order terminating parental rights based on an adoption petition, we construe the evidence favorably to the trial court's ruling and determine "whether any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights to custody have been lost." (Citation and punctuation omitted.) *Sellers v. Sellers*, 277 Ga. App. 814 (627 SE2d 882) (2006). We do not weigh the evidence or assess witness credibility, but defer to the trial court's factual findings and affirm unless this standard is not met. *Davis v. Rathel*, 273 Ga. App. 183 (614 SE2d 823) (2005).

So viewed, the evidence shows that R. C. J. was born on December 19, 1997, and his parents divorced in May 2000. Pursuant

to the divorce settlement agreement, which was incorporated into the divorce decree, the mother retained physical custody of R. C. J., she and Johnson had joint legal custody, and Johnson was entitled to weekly supervised visitation. The supervised visitation was to continue until Johnson passed six months of drug screens, after which his visitation rights would increase. The agreement further required Johnson to pay the mother $500 per month in child support and share in R. C. J.'s medical and dental expenses.

The mother married Taylor in September 2001, when R. C. J. was three years old. At the hearing, the mother described R. C. J.'s relationship with Taylor as "very close," noting that R. C. J. has never referred to anyone but Taylor as "Dad" and that Taylor is fully involved in her son's day-to-day life, education, and activities. According to the mother, Taylor "[has] been there for every milestone and everything major, 100 percent." The mother further testified that Taylor is "the only father [R. C. J. has] ever known."

In contrast, the mother testified that Johnson has not been involved in her son's life. When the mother first informed Johnson of the pregnancy, he expressed no excitement or interest and indicated that he could not support a child. Their marriage at that point was "on very, very shaky ground," and they separated several months later. During the pregnancy, Johnson provided no financial or other support to the mother, and he spent only one hour with his newborn son on the night of R. C. J.'s birth, then went to a nightclub. Thereafter, he had little interaction with the baby, although R. C. J.'s paternal grandmother sometimes spent time with the child during the day while the mother was at work. The mother eventually discovered that Johnson was involved with drugs, and she filed for divorce.

According to the mother, Johnson never exercised any facet of his joint legal custody over R. C. J., and he did not take the drug tests necessary to obtain unsupervised visitation. Although Johnson paid the mother some child support in the first year after the divorce, he made all payments grudgingly and never met his full monthly support obligation. The mother further testified that Johnson has not helped with R. C. J.'s medical and dental expenses, despite the requirement in the parties' divorce settlement agreement.

At some point in 2000, Johnson moved to Miami, where he lived until January 2002. During that period, the mother received child support payments, but Johnson never paid the full monthly amount or caught up on his support arrearage. Moreover, much of the money arriving from Florida actually came from Johnson's girlfriend, who testified that she sent the mother money because Johnson, who was not working, had none, and she knew the mother needed help.

While Johnson lived in Miami, he did not send R. C. J. any cards, gifts, or letters. On one occasion, the mother traveled with R. C. J. to Florida to see Johnson, but Johnson appeared for the visit several hours late and was drunk. Johnson's family took R. C. J. to Florida for two additional visits, and Johnson testified that he saw R. C. J. at the grandmother's house "a few times" when he was in Georgia. Although Johnson claimed that the mother prevented other visits, the mother testified that she encouraged his participation in R. C. J.'s life at that point.

Johnson's Florida residency ended in early 2002, when he began a five-year federal prison sentence for selling drugs. The mother testified that while incarcerated, Johnson did not write R. C. J., send him any cards, or provide any monetary support for the child. Johnson called the mother occasionally from prison and sometimes inquired about R. C. J., but never asked to speak to his son. It appears, however, that he spoke with R. C. J. several times by telephone when R. C. J. was visiting his paternal grandmother. Johnson also offered evidence that he wrote R. C. J. one letter in 2003, which he sent to the grandmother's house.

The mother admitted that the paternal grandmother sent her several checks for child support in late 2006 and 2007, after the grandmother learned that Taylor planned to petition for adoption, but none was for the full support amount. Prior to those checks, she last received child support from Johnson or his family in January 2002. At the hearing, Johnson did not dispute that he was $36,000 in arrears on his support obligation.

In February 2007, shortly after Johnson's release from prison, Taylor petitioned to adopt R. C. J. pursuant to OCGA § 19-8-6 (a) (1), which governs stepparent adoptions. Generally, the biological parent whose rights will end with the adoption must "voluntarily and in writing surrender[ ] all of his rights to the child to [the stepparent] for the purpose of enabling [the stepparent] to adopt the child." OCGA § 19-8-6 (a) (1). A voluntary surrender, however, is not always necessary. The stepparent's adoption petition may be granted without the biological parent's consent

> if that parent, for a period of one year or longer immediately prior to the filing of the petition for adoption, without justifiable cause, has significantly failed:
>
> (1) To communicate or to make a bona fide attempt to communicate with [the] child in a meaningful, supportive, parental manner; or
>
> (2) To provide for the care and support of [the] child as required by law or judicial decree,

and the court is of the opinion that the adoption is for the best interests of [the] child.

OCGA § 19-8-10 (b).

After hearing extensive evidence, the trial court found that (1) Johnson significantly failed for over one year, without justifiable cause, to communicate or attempt to communicate with R. C. J.; (2) he significantly failed to support the child financially; and (3) adoption by Taylor would be in R. C. J.'s best interest. The court granted Taylor's petition, despite Johnson's refusal to voluntarily surrender his parental rights. We find no error.

1. At the time of the hearing, Johnson had not seen his son in over five years. While incarcerated between 2002 and 2007, he wrote R. C. J. only one letter, which he mailed to the grandmother's house in August 2003, more than three years before the adoption petition was filed. He sent no other cards, letters, or mementos. During this same period, Johnson never asked to speak with his son when he called the mother's house, although he apparently talked with R. C. J. several times by telephone when the child was visiting the grandmother.

On appeal, Johnson argues that the mother "stonewall[ed]" his efforts to keep in touch with his son from prison. The mother, however, directly refuted this claim, asserting that she always accepted his collect calls from prison, that he never sought to speak with R. C. J., and that prior to his incarceration she tried to keep him involved in R. C. J.'s life. Although Johnson offered competing evidence, "[i]t was for the trial court, and not for the appellate court, to assess the credibility of the witnesses and resolve contested factual issues." (Citations omitted.) *Davis*, supra, 273 Ga. App. at 186 (3).

At best, the record demonstrates infrequent and minimal efforts by Johnson to communicate with his son in a meaningful, supportive, and parental manner throughout the five years immediately preceding the adoption litigation. We recognize that Johnson was in federal prison during this period, and incarceration is often relevant in assessing "justifiable cause" for a failure to support or communicate with a child. *Ray v. Denton*, 278 Ga. App. 69, 71 (1) (628 SE2d 180) (2006). The trial court, however, "is vested with significant discretion in making the determination as to whether the parent's inaction is excusable." (Citation omitted.) *Bateman v. Futch*, 232 Ga. App. 271, 273 (1) (501 SE2d 615) (1998). Moreover, incarceration does not establish justification per se; "[e]ach case must be decided on its own circumstances." (Punctuation omitted.) *Ray*, supra, 278 Ga. App. at 71.

Johnson could have written R. C. J., sent him cards, or telephoned him regularly while in prison, but he did not do so. The

record further shows that even before his imprisonment in 2002, Johnson's contact and visits with R. C. J. were sporadic. Under these circumstances, the trial court was authorized to find a lack of significant communication under OCGA § 19-8-10 (b) (1).[1] See *Bateman*, supra, 232 Ga. App. at 273-274 (1); *In re J. S. J.*, 180 Ga. App. 873, 875 (3) (350 SE2d 843) (1986) ("[W]ith regard to support and communication, 'sporadic and de minimis' efforts do not require the court to find that there have been significant steps. [Cits.]").

2. Given our decision in Division 1, we need not address whether Johnson significantly failed, without justifiable cause, to support R. C. J. for more than one year. See *Sellers*, supra, 277 Ga. App. at 816 (because the requirements of OCGA § 19-8-10 (b) (1) and (b) (2) are *alternative*, we may affirm based on the evidence supporting a finding under one subsection, even if the trial court made findings under both).

3. Finally, the trial court did not err in concluding that adoption by Taylor would be in R. C. J.'s best interest. The superior court has broad discretion in matters of adoption, and its judgment will not be reversed absent an abuse of that discretion. *Bateman*, supra, 232 Ga. App. at 274 (2). "If there is any evidence to support the trial court's finding that the adoption is in the child's best interest, such finding will be affirmed." Id.

The evidence shows that R. C. J. views Taylor as his "Dad," and Taylor has been a father figure for the boy since 2001. In this role, Taylor has been intimately involved in R. C. J.'s daily life, participating in his activities, teaching him skills, and generally functioning as a loving, concerned parent. Taylor also testified that he is financially able to take care of R. C. J., and the evidence shows that he has supported the boy for years.

In contrast, Johnson has had very limited contact with R. C. J., provided virtually no financial or parental support during his five-year incarceration, and has generally expressed little interest in supporting or parenting the boy himself. We recognize that R. C. J. has spent time with his paternal grandmother, who clearly wants to remain part of his life. But the mother testified that her son does not have a close relationship with his grandmother, and given the

---

[1] Our decision in *Thaggard v. Willard*, 285 Ga. App. 384 (646 SE2d 479) (2007), upon which Johnson relies, does not demand a different result. In *Thaggard*, the trial court concluded that the biological father had made sufficient efforts to communicate with his child and *denied* an adoption petition. We upheld that denial, noting that the evidence supported the trial court's findings. See 285 Ga. App. at 388 (2). In contrast, the trial court here found a lack of significant communication, and the evidence supports that determination. Given the applicable standard of review, our decision affirming the denial of the *Thaggard* adoption petition does not in any way require that we reverse the trial court's order granting the petition in this case.

evidence presented, we cannot find that the trial court abused its broad discretion in finding the adoption to be in R. C. J.'s best interest. See *Ray*, supra, 278 Ga. App. at 72; *McCurry v. Harding*, 270 Ga. App. 416, 420 (4) (606 SE2d 639) (2004).

*Judgment affirmed. Mikell and Adams, JJ., concur.*

### DECIDED JUNE 27, 2008.

*Ballard, Stephenson & Waters, Eugene D. Butt*, for appellant.
*Michael E. McLaughlin*, for appellee.